THE PEOPLE OF THE STATE OF NEW YORK ex rel. LEHIGH
    VALLEY RAILWAY COMPANY, Appellant, *v.* WILLIAM J.
    BURKE et al., as Assessors of the City of Buffalo,
    Respondents.

Tax — assessment — certiorari — appraisal of value of lands under water — value of land when filled less cost of filling proper measure of value — upon appeal on certiorari where proof shows value of lands depends upon uncertain and highly speculative factors, valuation by trier of facts should not be disturbed — exhibition by relator of valuation report to clerks of Interstate Commerce Commission not a controlling admission that lands are worth amount stated therein.

1. In appraising, for purposes of taxation, submerged land, which has never been put to industrial uses and has never produced a revenue, the value of the land when filled less the cost of filling is a proper measure of its present value.

2. Upon appeal in a certiorari proceeding to review an assessment, for purposes of taxation, of real estate, all but a small portion of which is under water, where, from the proof, the conclusion is inevitable that the value of the lands depends upon factors which are uncertain and in a high degree speculative, the valuation by the referee, of which the relator makes no complaint, should not have been disturbed.

3. A contention that the exhibition by the relator, a railroad corporation, of a certain valuation report, to appraisal clerks in the employ of the Interstate Commerce Commission, wherein the lands in question were valued at a much greater amount than that at which they were assessed, constitutes a controlling admission by the relator upon the question at issue, cannot be sustained, where the value of the property in question was not in issue before the Commission,

the report upon its value was not used either to fix rates or to establish a maximum sum to limit the issuance of securities, it was not vouched for by the relator except as it was submitted by it, with other data, to the consideration of the Commission and the valuation was in terms based upon a purported sale of underwater lands which in fact was never effectuated.

People ex rel. Lehigh Valley Ry. Co. v. Burke, 221 App. Div. 248, reversed.

(Argued December 7, 1927; decided January 20, 1928.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered June 28, 1927, which reversed an order of Special Term reducing an assessment on real property in the city of Buffalo for purposes of taxation.

*Lyman M. Bass* for appellant. The market value of relator's property as of December 1, 1922, must be determined in the light of all of the circumstances surrounding it, including its marketability for the purpose of being subdivided into parcels, the number of years which must reasonably lapse before the whole property can be disposed of, its unavailability for use without the expenditure of money for filling in, and any other relevant facts. (*People ex rel. Strong* v. *Hart*, 216 N. Y. 513; *People ex rel. City of New York* v. *Keeler*, 237 N. Y. 332; *People ex rel. N. Y. C. R. R. Co.* v. *State Tax Comm.*, 206 App. Div. 553; *Adams Express Co.* v. *Ohio*, 166 U. S. 185; *Wilcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Bluefield Co.* v. *Public Service Comm.*, 262 U. S. 679; *Southwestern Tel. Co.* v. *Public Service Comm.*, 262 U. S. 276; *Georgia Ry. Co.* v. *Railroad Comm.*, 262 U. S. 625; *People ex rel. Sebring* v. *Dowd*, 206 App. Div. 727; *People ex rel. U. S. Rubber Co.* v. *Knapp*, 232 N. Y. 153.) The valuation and assessment of property for taxation under section 6 of the Tax Law of the State of New York is unrelated to the valuation of property by the Interstate Commerce Commission under the Interstate Commerce Act and in particular sections 19-a and 15-a thereof.

(*State Public Utilities Comm. ex rel. Springfield* v. *Spring-field Gas & Elec. Co.*, 125 N. E. Rep. 891; *Poplar* v. *Speed Elec. Co.*, [Mont.] P. U. R. 1922B, 367; *C. & N. W. Ry. Co.* v. *Eveland*, 13 Fed. Rep. [2d] 442; *Temmer* v. *Denver Tramway Co.*, 18 Fed. Rep. [2d] 226.)

*Frederic C. Rupp, Corporation Counsel,* and *Herbert A. Hickman* for respondents.   The admission of evidence of the sale of a part of this property, made two years after the assessment under review, and while the trial of this proceeding was in progress, and its use as the basis for the referee's finding of value, constituted error and the Appellate Division was right in disapproving the finding based thereon. (*Latimer* v. *Burrows*, 163 N. Y. 7; *Sebring* v. *Wellington*, 63 App. Div. 498; *Jamieson* v. *Elevated R. R. Co.*, 147 N. Y. 322.)   The valuation of this land by relator before the Interstate Commerce Commission was competent evidence here.   (*People ex rel. Jamaica Water Supply Co.* v. *Tax Comrs.*, 196 N. Y. 39; *People ex rel. Railroad Co.* v. *Keator*, 36 Hun, 592; *Arnold* v. *Parmelee*, 97 N. Y. 652; *People ex rel. Ward* v. *Sutton*, 186 App. Div. 550; *People ex rel. R., W. & O. R. R. Co.* v. *Hicks*, 105 N. Y. 198; *Stecher Litho. Co.* v. *Inman*, 175 N. Y. 124; *Pierson* v. *Atlantic Nat. Bank*, 77 N. Y. 304; *Nowack* v. *Met. St. Ry. Co.*, 166 N. Y. 433; *Maller* v. *Long Island R. R. Co.*, 122 App. Div. 463; *Boyce* v. *Greeley Square Hotel Co.*, 181 App. Div. 61; 228 N. Y. 106; *Hitchman C. & C. Co.* v. *Mitchell*, 245 U. S. 229.)

KELLOGG, J.   This is a certiorari proceeding to review an assessment of certain real estate of the relator, made by the respondents, assessors of the city of Buffalo, for general tax purposes for the year 1923.   The property was assessed at the figure of $1,378,000.   The issues joined by the service of a return to the writ of certiorari were referred by the Special Term to a referee to take evidence and report the same with his findings of fact and conclusions of law.   The referee took the proof,

found as a fact that the full value of the land did not exceed the sum of $498,626, and reported to the Special Term that the relator's assessment should be reduced to the figure named. The Special Term adopted the findings of the referee and ordered the assessment reduced to the sum of $498,626. The Appellate Division, upon an appeal to it by the present respondents, reversed the Special Term, found that the true value of the land was the sum of $1,378,000, and directed that the assessment made by the respondents, at the sum named, be reinstated. Thereupon the relator took this appeal.

The subject of the assessment is a tract of land having an area of 226.725 acres, situate within the city limits of the city of Buffalo, and about two miles distant from the business center thereof. It is a strip running northerly and southerly, at the easterly end of Lake Erie, with a length of 5,937.44 feet, or approximately one and one-eighth miles, and a width varying from 1,444 feet, at its southerly boundary, to 2,101 feet on its northerly boundary. All of the land, except about twelve acres, lies under the waters of Lake Erie. Its easterly boundary is the Hamburg turnpike, a paved street carrying the rails of a surface railroad, upon which trolley cars run along the entire frontage. Beneath the Hamburg turnpike there is an under-pass which affords a means of connection between the assessed land and the railroad lines of the relator lying to the east of the turnpike. Sloping banks from the turnpike to the water's edge constitute the twelve acres of uplands. The remainder of the property, or about 215 acres, is under water having a mean depth of 8.6 feet. The vertical distance from the surface of the water to bedrock averages sixty feet. The westerly line of the property is the harbor line established by the United States government. Still farther westerly is a breakwater maintained by the United States, which extends the full length of the property. About 1,600 feet of water lie between this breakwater and the harbor line.

Title to the land came to the relator from two sources. It had acquired many years prior to the year 1921, from individual owners, that portion of the land which lies east of the shore line of Lake Erie.   The waters of Lake Erie, through a series of years, had washed away the original shore, so that it became necessary for the Legislature to establish the correct boundary line.   Accordingly, the line was fixed by statute in the year 1913 at a point which gave to the relator's holdings an area of 111.49 acres, of which about one hundred acres were under water.   This property had been assessed by the city of Buffalo, during the years 1917 to 1922, at the figure of $85,500, or at the rate of approximately $760 an acre.   In the year 1921 the remainder of the land, consisting of 115.235 acres, was purchased by the relator from the State of New York for the sum of $86,426.25, or at the rate of about $750 an acre.   This carried the relator's proprietorship to the established harbor line. Thereafter, the city of Buffalo, acting through these respondents, made this assessment, appraising the land at about $6,000 per acre.

Self-evidently the exact counterpart of the relator's land does not exist.   Nor has any parcel of land, similar in area, location and adaptability for industrial uses, ever been the subject of purchase and sale.   Consequently, no identity of opinion on the part of traders, as to the value of this land, tested by moneys actually paid and received for other lots of an identical character, has ever been exhibited by any market.   Moreover, the land, which is almost wholly submerged, has never been put to industrial uses, and has never produced a revenue. Therefore, its value cannot be judged by the fact of market price or the fact of previous earnings.   It must necessarily rest, for the purposes of this proceeding, in the opinion of the trier of fact, based upon data of an exceedingly uncertain and unsatisfactory character.

The respondents insist that the strongest proof, upon

which to base an opinion as to the value of the land, will be found in facts proven by them in relation to three sales of underwater lands, in the vicinity of the land in question. These sales are: 1. A sale in March, 1918, of 7.14 acres of land to the Empire Engineering Company at a price of $17,000 per acre. 2. A sale in 1923 of 7.86 acres by the Buffalo Harbor Land Company to the city of Buffalo at a price of $25,000 per acre. 3. A sale in December, 1923, of 5½ acres by Alice Perew to the city of Buffalo at a price of $24,500 per acre. All these parcels lie under the waters of Lake Erie at points north of the land in question. They are situate at least one mile nearer to the business center of the city of Buffalo. The area sold aggregates 20½ acres. Six years were required to make the sales. At this rate it would take approximately sixty-six years to effect a sale of all the 226 acres here involved. The purchase of the parcel sold to the Empire Engineering Company was made to procure a site for industrial operations for the purposes of the Great War. The other purchases were made by a municipality. In all such transactions political considerations and influences frequently play a part. Moreover, these sales are balanced by the sale made in January, 1917, to the South Buffalo Railroad Company. This parcel was just south of the land in question and consists of 21.76 acres of land, of which not more than five acres were under water. The purchase price of this parcel was at the rate of $19,300 per acre. In other words, the filled-in land sold at a less price than the sum which the preponderance of the proof shows would have been the cost per acre of filling an equal acreage. The sale tends, therefore, to establish the proposition that the submerged tract now under consideration is without economic value. These sales indicate a widely divergent opinion as to the value of underwater properties in this vicinity. Twenty acres of unfilled land, on the one hand, sold for more than $17,000 an acre. On the other hand, twenty

acres of land, three-quarters of which was filled-in land, sold at approximately the same price, or a price not equal to the price of the filling. Moreover, opinions expressed thereby as to the value of two twenty-acre parcels necessarily involve considerations widely different from those involved when, as here, the opinion to be formed relates to the value of a tract of 226 acres.

The respondents also assert that the exhibition by the relator of a certain valuation report, to appraisal clerks in the employ of the Interstate Commerce Commission, was a fact of controlling importance. The Commission had made a tentative report valuing the relator's properties. This covered carrier properties of the relator in Buffalo as well as non-carrier properties. The former were tentatively valued for rate-making purposes. The latter were tentatively valued, since they might become important in determining the maximum limit for the issuance of securities by the relator. (Act of Congress of March 1, 1913, sec. 19-a.) The relator made no objection to the valuation of the non-carrier properties, which included the property in question. It does not appear that any application to issue securities was before the Commission. A Mr. Parke, a real estate dealer in Buffalo, had made a written report to the relator in which he had valued all the relator's Buffalo properties, whether carrier or non-carrier. Upon this report there appeared an appraisal of the property in question at the figure of $10,000 per acre. The entire report was exhibited by the relator to clerks in the valuation bureau of the Commission. It is said that this constituted a controlling admission by the relator upon the question at issue. We think otherwise. The value of the particular property in question was not in issue before the Commission. The report upon its value was not used either to fix rates or to establish a maximum sum to limit the issuance of securities. It was not vouched for by the relator except as it was submitted by it, with other data, to the con-

234 People ex rel. Lehigh Valley Ry. Co. *v.* Burke.

[247 N. Y. 227]         Opinion, per Kellogg, J.                    [Jan.,

sideration of the Commission. It is as if the relator had said to the Commission, "We have no quarrel with you as to the valuation made of our non-carrier properties. However, we have in our files a valuation report upon all our properties, including our lands under water, made by a Buffalo real estate dealer, which you may look at and which we now submit." This attitude of the relator was far removed from a position of express approval of the report or an assertion of its correctness. Moreover, even if it be thought that the relator by its submission of the report impliedly declared that the land in question was worth $10,000 per acre, it must be remembered that the declaration, when made, was not against the relator's interest. This fact, while it made the declaration none the less admissible, nevertheless impaired its weight as a determining factor upon the issue here involved. (Wigmore on Evidence, sec. 1048.) The assessors themselves did not take the declaration at its face value, for they found the properties worth not $10,000 per acre, but $6,000 per acre. Moreover, the valuation made by Mr. Parke was in terms based upon a purported sale of underwater lands to the Standard Milling Company, a sale which in fact was never effectuated. For all these reasons we consider that the conduct of the relator, in submitting the Parke report to a bureau of the Interstate Commerce Commission, is not, for the decision of issues here presented, of controlling importance.

The price which a buyer will pay for land which can be made useful for industrial purposes only, in the last analysis, must depend upon the investment required thus to make it useful. "Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated." (Per Mr. Justice

FIELD in *Boom Co.* v. *Patterson,* 98 U. S. 403.)  The land in question, in its present submerged condition, is useless for any industrial or economic purpose.  " Its capability of being made thus available " for such uses will determine its value, if valuable it be.  According to the relator's experts the cost of filling in the land, in order to lift it to a point ten feet above water, will be $30,000 per acre, or approximately seven million dollars for the whole. According to the chief engineer of the city of Buffalo, the cost will be $56,000 per acre, or more than twelve million for the whole.  An intending purchaser of the entire tract, in making a decision as to the price which he would pay therefor, reasonably would consider the following facts:  1. In order to make the land available for industrial purposes the use of at least seven million dollars must first be expended to lift the land above the water line.  2. The land as thus improved cannot, as a whole, be immediately disposed of for industrial purposes.  The land is adapted to the use of a grain elevator business.  However, it cannot, as an entire tract, be devoted to such purposes.  All the land in the city of Buffalo, one of the great milling centers of the world, upon which a grain elevator business is prosecuted, comprises less than sixty acres.  The relator has commissioned many real estate brokers in the city of Buffalo to sell the tract.  Nevertheless, during the lapse of several years no substantial offers have been received therefor.  The Ford Motor Company, the Standard Oil Company, the Pillsbury Flour Mill, and many other large manufacturing concerns have passed up the property and located their plants elsewhere within the city of Buffalo or in its vicinity.  3. Many years will be required to sell the property parcel by parcel.  Witnesses have testified that from fifty to seventy-five years will have passed before the land can thus be disposed of.  If the purchaser seeks to sell at the high prices paid by the Empire Engineering Company and the city of Buffalo

236   People ex rel. Lehigh Valley Ry. Co. *v.* Burke.

[247 N. Y. 227]          Opinion, per Kellogg, J.                    [Jan.,

for three small parcels the time which will elapse before
the sales are completed, judged by the time elapsing in
the case of such sales, may be sixty-six years.   On the
other hand, if he chooses to make immediate sales at
the price controlling the South Buffalo Railroad Com-
pany sale he will not receive the cost of filling in the
lands to make the sale.   4. The purchaser who makes
the necessary filling will have invested at least seven
million dollars in property which brings no annual return.
Interest and taxes will be such that the amount of the
investment will be doubled at the end of every ten years.
At the end of ten years he will have an investment of
approximately fifteen million; at the end of twenty years
of thirty million; at the end of thirty years of sixty
million.   In order to break even, for moneys expended
in mere improvements, he must have disposed of all the
property at the end of one of these periods for at least
the amount which the investment will then total, as
shown by the foregoing table.   We think that when an
intending purchaser had considered these facts he would
not be ready to pay a high price therefor.

In *First Construction Co.* v. *State of New York* (221
N. Y. 295) this court had under consideration the proper
method of appraising the value of a franchise from the
State to fill in underwater lands.   It said: "The value
of the right in this respect will be the value of the land
when filled in less the cost of filling and the addition
of value as the result of filling in may be greater or less
than the cost of the latter operation."   We see no reason
why the same method may not be employed to appraise
the value of submerged lands where full title thereto,
rather than a franchise therein, is privately owned.   In
either case the land may not become useful without
filling.   Therefore, the cost of filling is a necessary factor
entering into the problem of value.   It is a factor which
every prospective buyer for investment would seek to
measure.   Its proper measure, therefore, might be of

help in determining the price at which the unfilled lands would sell.

Summarizing the proof we find this state of facts: The land in question is presently unproductive of income. No tract of land, similar in area and location, has ever been the subject of a market sale. No offers for the entire tract have ever been received. Lands similarly located, which have brought a substantial price, have a total area of 20 acres, or less than one-tenth the acreage of the land in question. They have been sold in three separate parcels through a period of six years. A parcel of upland, equal in area, has been sold at a price, judged by which underwater lands in this location are without value. Many years will be required to sell the land in question in small parcels at advantageous prices. It is problematical whether the lands can be brought above the water level and then sold at a price greater than the cost of filling. From these facts, the conclusion inevitably follows that the value of the lands depends upon factors which are uncertain and in a high degree speculative. Under the circumstances we think that the valuation made by the referee, of which the relator makes no complaint, should not have been disturbed.

The order of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in the Appellate Division and in this court.

CRANE, J. (dissenting). The assessors fixed the valuation of the relator's land under water at $6,000 an acre. The Appellate Division on review of the evidence sustained this assessment. There was competent evidence to justify this conclusion of the Appellate Division.

Relator railroad company when it was seeking adjustment of its capitalization before the Interstate Commerce Commission desired to fix the valuation of its property at as high a figure as possible. We must assume that it did not intentionally deceive the Commission. It sought to get from the Commission a ruling which would give

it as large an income as the law and the facts would allow. It, therefore, placed a valuation through real estate experts upon this property of $10,000 an acre.

Now that it has to give instead of receive; is obliged to give to the public in the form of taxes instead of get from the public by the sale of securities, it complains that the valuation of $6,000 an acre is too high; that it should be very materially reduced.

I think a good safe way to proceed in all these matters is to take the railroad company at its own valuation. It at least leads to fair dealing. Such methods justify criticism and lack of public confidence. If $10,000 was a proper valuation upon which to get money, $6,000 was none to high for taxation. I know of no rule which permits such drastic fluctuations according to the purpose of the valuation.

I vote for affirmance.

Cardozo, Ch. J., Pound, Andrews, Lehman and O'Brien, JJ., concur with Kellogg, J.; Crane, J., dissents in opinion.

Ordered accordingly.